# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

MIRBEAU OF GENEVA LAKE, LLC,
STATE OF WISCONSIN *ex rel.*
MIRBEAU OF GENEVA LAKE, LLC,,

                     Plaintiffs,

       v.                                 Case No. 08-CV-693

CITY OF LAKE GENEVA, TODD KRAUSE,
GARY DUNHAM, MARY JO FESENMAIER,
ARLEEN KROHN, LARRY MAGEE,
TOM SPELLMAN, DONALD TOLAR,
WILLIAM CHESEN, PENNY ROEHRER,
FRANK MARSALA,
LOWER DENSITY DEVELOPMENT, LLC,
THOMAS MUENSTER, JAMES CONNORS, and
RICHARD MALMIN,

                     Defendants.

_____

# ORDER

On July 1, 2010, the plaintiff, Mirbeau of Geneva Lake LLC ("Mirbeau"), filed

its Second Amended Complaint that, in relevant part, added defendants (collectively

"non-city defendants") Lower Density Development, LLC, ("LDD"), Thomas Muenster

("Muenster"), James Connors ("Connors"), and Richard Malmin ("Malmin") as parties

to the action. (Docket #77). A bevy of motions soon followed. On August 5, 2010,

the plaintiff filed a motion for default judgment against Mr. Malmin. (Docket #91).

The following day, LDD and Mr. Muenster filed a motion to dismiss the complaint.

(Docket #96). Within the hour, two additional motions were filed. Mr. Malmin filed

a motion to set aside the default judgment (Docket #100), and Mr. Connors filed a

motion to dismiss the complaint. (Docket #101). On August 27, 2010, the plaintiff filed a response to the three motions filed on August 5, 2010 (Docket #'s 115, 116, 118), and also filed a motion for leave to file the Third Amended Complaint to repair infirmities with the Second Amended Complaint. (Docket #119). Less than a month later, the plaintiff filed a motion for leave to file a "sur-response" brief in opposition to the motions to dismiss. (Docket #127). On October 20, 2010, the plaintiff filed an expedited motion to strike a supplemental response to the motion to dismiss by Messrs. Connors and Malmin. (Docket #135). In response to the plaintiff's motion to strike, defendants Connors and Malmin submitted a motion to file supplemental authority on October 22, 2010. (Docket #136). As promised in this court's August 10, 2010 order (Docket #111), the court, in this order, will now resolve the various motions pending on this case's docket such that this action can get back on track. The court begins by addressing the motions to dismiss.[1]

## MOTIONS TO DISMISS

As this court has noted in its previous orders, this case arises from Mirbeau's failed attempts to persuade the City of Lake Geneva to change the zoning classification for 54.5 acres of land such that the plaintiff could develop the area into a commercial and residential area with a hotel, residential cottages, a winery, and

---

[1]The court notes that Mr. Malmin has not formally moved the court to dismiss the complaint against him, as there is an entry of default against him. However, Mr. Malmin has asked the court to grant him leave to file a motion to dismiss if the court grants the motion to set aside the entry of default. (Docket #101). The proposed motion to dismiss is identical to the motion provided by Mr. Connors. Accordingly, the court will resolve the merits of Mr. Malmin's motion to dismiss with Mr. Connors motion to dismiss, assuming, without first deciding, that the court can allow Mr. Malmin to file his motion to dismiss.

neighborhood retail. (Sec. Am. Compl. ¶¶ 21-22). The latest allegations note that the approval of the zoning change within a year of April 23, 2007, was a condition necessary to effectuate a sale of the 54.5 acres from Geneva Ridge Joint Venture ("Geneva Ridge") to Mirbeau. *Id.* ¶ 23. The Second Amended Complaint, much like its previous version, generally alleges that the City and members of the City's council[2] (collectively the "city defendants"[3]), in rejecting Mirbeau's application for a zoning change permit to develop the property in question, conspired in a series of backroom deals to treat the plaintiff differently from other similarly situated applicants without any rational basis, resulting in a denial of equal protection of the law for Mirbeau as guaranteed by the Fourteenth Amendment to the United States Constitution. *Id.* ¶¶ 34-35; 72-75. The Second Amended Complaint also alleges several new, related federal and state constitutional infirmities with the city defendants' actions. Mirbeau claims that the city defendants retaliated against the plaintiff for its "exercise of its constitutional right to petition," in violation of the First Amendment as applied to the states through the Fourteenth Amendment. *Id.* ¶¶ 76-78. The plaintiff also contends that the city defendants, in denying Mirbeau's zoning amendment application, violated Mirbeau's procedural and substantive due process rights as protected by the Constitution of the State of Wisconsin. *Id.* ¶¶ 79-84.

---

[2]Specifically, the remaining "city defendants" are Todd Krause, Gary Dunham, Mary Jo Fesenmaier, Arleen Krohn, Larry Magee, Tom Spellman, Donald Tolar, William Chesen, Penny Roehrer, and Frank Marsala.

[3]The court notes that there is a distinction between the "city defendants" and a "City" official or a state actor for purposes of 42 U.S.C. § 1983, in that Ms. Roehrer was not a City official until February of 2008.

Additionally, the Second Amended complaint alleges that the city defendants violated the Wisconsin Open Records Law, Wis. Stat. § 19.35, and the Wisconsin Open Meetings Law, Wis. Stat. §§ 19.83 and 19.84. *Id.* ¶¶ 85-105.

Most relevant to the present motions to dismiss, the Second Amended Complaint alleges two central claims against LDD and Messrs. Muenster, Connors, and Malmin . Before delving into those claims, however, it is important for the court to note who the newest parties to this dispute are. LDD is a Delaware limited liability company that attempted to purchase the same plot of land that Mirbeau was expecting to develop. (Sec. Am. Compl. ¶¶ 14; 44). Mr. Muenster, a resident of South Dakota, "is the manager of LDD." *Id.* ¶ 15. Mr. Connors is the current Mayor of Lake Geneva and, according to the latest complaint, at the time of the events driving the legal claims alleged against him, was the "founder and treasurer of Vote-No Mirbeau-Hummel," ("Vote-No"), a political action subcommittee formed to oppose Mirbeau's zoning amendment application. *Id.* ¶¶ 16, 132. Mr. Malmin is a resident of Lake Geneva and was an "active" member of "Friends of Geneva Lake, Inc." ("FOGL"), a "Wisconsin political action committee opposed to development of the property" by Mirbeau. *Id.* ¶¶ 17, 53, 120, 126.

In its eighth claim for relief,[4] Mirbeau generally alleges that the non-city defendants and two of the city defendants tortiously interfered with Mirbeau's

_____

[4]The court discusses the claims in the order they are presented in the proposed Third Amended Complaint, as the proposed complaint switched the place of the seventh and eighth claims in the Second Amended Complaint such that the tortious interference claim was explicitly incorporated into the federal conspiracy claim.

contract to purchase the 54.5 acres of land from Geneva Ridge. *Id.* ¶¶ 116-158.

Specifically, Mirbeau contends that LDD "intentionally interfered with" the plaintiff's

contract and "delayed the Mirbeau Zoning Amendment Application review process"

in order to "drive down the value" of the property in question, such that LDD could

"acquire title at less than market price." *Id.* ¶¶ 117-120. The plaintiff alleges that

LDD's tortious interference began when Mr. Muenster, as LDD's manager,

communicated with the remaining defendants that LDD would "wait to develop the

property and would develop it less densely than [Mirbeau's] development plans." *Id.*

¶ 121. Mirbeau further states that Mr. Muenster began working "behind the scenes"

with "representatives of FOGL," including Malmin, Connors, and now-city

councilwoman and then-candidate for city council Penny Roehrer, "formulat[ing] and

pursu[ing] a strategy of ongoing and improper tactics," including having a public

referendum on the zoning change, "to delay review and approval of [the plaintiff's]

Zoning Amendment Application for the purpose of preventing Mirbeau from

consummating its Purchase Contract." *Id.* ¶¶ 120, 125-27, 136. Roehrer, in turn,

"regularly communicat[ed]" with Mary Jo Fesenmaier, a member of the City's council,

"in an effort to obtain inside information concerning the City council's handling of

Mirbeau's pending Zoning Amendment Application." *Id.* ¶ 129. Throughout the

process, LDD allegedly "made promises and representations to Roehrer, Malmin,

Connors, Fesenmaier, other members of FOGL, and to the public that LDD's

development plans for the property," such as possibly donating a portion of the

property to a conservation group, "would be much more desirable and acceptable than those of Mirbeau." *Id.* ¶¶ 130, 143. "At the same time LDD was making [such] promises," Mirbeau further alleges that Mr. Muenster, in late 2007 and early 2008: (1) was attending FOGL meetings aimed at derailing, through an appropriately worded public referendum, the plaintiff's attempts to acquire the zoning change permit; and (2) was communicating with FOGL regarding the need "for new money to support the LDD-driven efforts" to thwart Mirbeau's project. *Id.* ¶¶ 132-34, 138-42, 145-147. The plaintiff further contends that during the same period of time – early 2008 – Mr. Connors was orchestrating the efforts of the FOGL subcommittee "Vote-No," a group that was formed with the help of Mr. Muenster and was "devoted exclusively to defeating Mirbeau's Purchase Contract." *Id.* ¶¶ 144, 147. According to the latest complaint, Mr. Connors and Mr. Muenster raised over thirty thousand dollars to support the Vote-No Mirbeau Hummel subcommittee from LDD and entities related to LDD. *Id.* ¶¶ 148-50. Mirbeau also alleges that after the April 1, 2008 election occurred – an election that resulted in: (1) Roehrer being selected as a member of the City council, *id.* ¶ 11; and (2) a referendum where the "majority . . . cast their ballots in opposition to the Zoning Amendment Application," *id.* ¶ 52 – Roehrer "continued to advise Muenster and LDD on appropriate strategies for acquiring the property." *Id.* ¶ 154. In total, Mirbeau alleges that Roehrer and Fesenmaier conspired with the non-city defendants, and "delayed and ultimately denied Mirbeau's Zoning Amendment Application with the improper, intentional, and

unjustified purpose of preventing Mirbeau from completing its Purchase Contract with Geneva Ridge." *Id.* ¶ 156.

Mirbeau's seventh claim for relief in its Second Amended Complaint, in contrast to the eighth claim for relief, is rather terse. Mirbeau generally alleges that the "City Defendants and the Noncity Defendants agreed to a plan to violate Mirbeau's federal and state constitutional rights and intentionally interfere with Mirbeau's Purchase Contract." *Id.* ¶ 113. The seventh claim for relief further explains that the collective "plan" of the defendants was aimed at . . . "prevent[ing] Mirbeau from purchasing and developing the property, . . . delay[ing] the rezone review process until Mirbeau's purchase contract expires, . . . forc[ing] a sale of the property to LDD for less than its market value and . . . allow[ing] the Noncity defendants, FOGL members, and other to control development" of the property in question. *Id.* The complaint alleges that the use of the referendum was a central means by which the defendants "delay[ed] and ultimately den[ied] Mirbeau's development." *Id.*

With the content of the Second Amended Complaint sufficiently in mind, the court proceeds to address the two pending motions to dismiss the complaint by: (1) Mr. Muenster and LDD; and (2) Messrs. Connors and Malmin. While there are two separate motions to dismiss, the legal standards guiding the court in addressing both motions remain the same. Fed. R. Civ. P. 12(b)(6) permits a defendant to make a motion to dismiss a complaint for failure to state a claim upon which relief can be

granted.  To survive a 12(b)(6) motion to dismiss, the plaintiff's complaint must only

"contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

*plausible* on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell

Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-57, 127 S. Ct. 1955, 167 L. Ed. 2d 929

(2007)) (emphasis added).  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."[5]  *Iqbal,* 129 S. Ct. at 1949.  When the

plaintiff's allegations "do not permit the court to infer more than the mere possibility

of misconduct," the complaint does not satisfy the minimal pleading burden of Rule

8 of the Federal Rules of Civil Procedure.[6]   *Id.* at 1950.  With these general

standards in mind, the court proceeds to first examine the arguments proffered by

the non-city defendants in their respective motions to dismiss with regard to the

federal claim.

---

[5]The court is also guided by the Seventh Circuit's synthesis of the Supreme Court's case law on Fed. R. Civ. P. 12(b)(6):

> "So, what do we take away from *Twombly, Erickson*, and *Iqbal*? First, a plaintiff must provide notice to defendants of her claims. Second, courts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim. Third, in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements."

*Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

[6]As such, the plaintiff's repeated citations to Seventh Circuit case law from the early 1990s opining on the standard to evaluate a motion to dismiss are at the very least unhelpful to the court.

### A.    Section 1983 Claim Against LDD and Messrs. Muenster, Connors, and Malmin

The briefing on the issue of the federal claim against the non-city defendants has been a bit disjointed to say the least.    The plaintiff, in its Second Amended Complaint, alleged that its seventh claim for relief arose under 28 U.S.C. § 1985(e). Of course, no such statute exists.    As a result, the non-city defendants were forced to guess at what claim for relief the plaintiff was attempting to allege against the two defendants.    The non-city defendants guessed that Mirbeau was trying to allege a 42 U.S.C. § 1985(3) claim, a seemingly logical conclusion given that: (1) the Second Amended Complaint's seventh claim for relief was entitled "conspiracy to injure Mirbeau and violate its constitutional rights," (Sec. Am. Compl. ¶ 113); and (2) 42 U.S.C. § 1985(3) is the federal cause of action for "conspiracy to interfere with civil rights."    Mirbeau stated in its response brief that "the statutory reference in . . . the Second Amended Complaint is a 'typo.'" (Pl.'s Resp. Br.[7] at 3).    The plaintiff instead contends that the conspiracy claim arises under 42 U.S.C. § 1983.    As a result of the plaintiff's error, the court only had the benefit of two briefs on the issue of the defendants' liability under 42 U.S.C. § 1983.    Nonetheless, the court proceeds to

---

[7] Unless otherwise specified, the references to the plaintiff's response brief are references to the response brief filed against LDD and Mr. Muenster's motion to dismiss.

examine the substance of each sides' arguments, giving the plaintiff the benefit of the doubt with regard to the typographical errors.[8]

To recover under Section 1983, a plaintiff must show that: (1) they were deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon them by a person or persons acting under color of state law. *McKinney v. Duplain,* 463 F.3d 679, 683 (7th Cir. 2006). Ordinarily, the latter requirement prevents private citizens, such as the non-city defendants, from being held liable under Section 1983. However, "if a private citizen conspires with a state actor, then the private citizen is subject to Section 1983 liability." *Brokaw v. Mercer County*, 235 F.3d 1000, 1016 (7th Cir. 2000). "To establish Section 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents." *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007) (internal citations omitted); *see also Stagman v. Ryan*, 176 F.3d 986, 1003 (7th Cir. 1999) ("We have held that to establish joint action, a plaintiff must demonstrate that the public and private actors shared a common, unconstitutional

---

[8] The court notes that a plaintiff is not bound by the legal characterizations of claims made in the complaint, *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir. 1992), and, therefore, specifying an incorrect legal theory in one's complaint is not fatal. *Id.* When responding to a motion to dismiss, however, a plaintiff must identify a legal basis for the claim at issue and make adequate legal arguments in support of it. *Kirksey v. R. J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999); *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1335 (7th Cir. 1995). Accordingly, the court examines the motion to dismiss as if the plaintiff originally asserted a Section 1983 claim against the plaintiffs that incorporated the tortious interference with contractual relations allegations into the Section 1983 claim.

goal."). "Vague and conclusory allegations of the existence of a conspiracy are not enough to sustain a plaintiff's burden; a complaint must contain factual allegations suggesting that the defendants reached a meeting of the minds" with respect to violating the plaintiff's constitutional rights. *Evers v. Reak*, 21 Fed. Appx. 447, 450 (7th Cir. 2001). Moreover, private actors do not act under the color of state law merely calling on the law for assistance, even though they may not have grounds to do so; rather, "there must be a conspiracy, an agreement on a joint course of action in which the private party and the state have a common goal." *Hughes v. Meyer*, 880 F.2d 967, 972 (7th Cir. 1989).

### 1.    Section 1983 Claim Against LDD and Mr. Muenster

With the general legal framework for examining a Section 1983 conspiracy claim discussed, the court now examines the Section 1983 claim with respect to LDD and Mr. Muenster. In its brief to the court, Mirbeau does not contend that Muenster and LDD conspired with the city defendants to violate the plaintiff's First Amendment rights, the second claim for relief in the Second Amended Complaint. Rather, Mirbeau merely argues that Mr. Muenster and LDD conspired with the city defendants to violate the plaintiff's equal protection rights. (Pl.'s Resp. Br. at 6) ("The Court has already ruled that Mirbeau's original complaint [with respect to an equal protection violation] stated a claim for violation of § 1983 against the City and the City defendants . . . The same deprivation forms the basis of conspiracy claims against LDD and Muenster"). The underlying equal protection violation alleged by

Mirbeau arises under the "class of one" equal protection theory, where the government intentionally treats a plaintiff differently from others similarly situated without any rational basis for the difference in treatment other than perhaps a "totally illegitimate animus." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) (per curiam). As such, in order for Mirbeau's federal claim against LDD and Muenster to survive the Fed. R. Civ. P. 12(b)(6) challenge, the complaint must allege that LDD, Muenster and the City officials had a "meeting of the minds" to deprive Mirbeau of its constitutional right to not be irrationally treated by the City government.

However, Mirbeau's Section 1983 claim against LDD and Muenster simply does not indicate that the two defendants conspired with the City officials *for the purpose of* violating the plaintiff's Fourteenth Amendment rights to equal protection under the law. In fact, nearly all of the passages of the latest complaint[9] cited by Mirbeau in its brief to support its federal conspiracy claim show that LDD's and Mr. Muenster's goals in their alleged dealings with City officials were unrelated to

---

[9]The only cited passage that asserts that the goal of *any* of the non-city defendants was to violate Mirbeau's constitutional rights is paragraph 113 of the Second Amended Complaint. However, paragraph 113 is an allegation lacking any warrants, broadly alleging that the city defendants and the non-city defendants "agreed to a plan to violate Mirbeau's federal and state constitutional rights and intentionally interfere with Mirbeau's purchasing contract." (Sec. Am. Compl. ¶ 113). Such allegations fail to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss. *Tamburo v. Dworkin*, 601 F.3d 693, 699 (7th Cir. 2010) (holding that claims that are alleged "in a wholly conclusory fashion" is "plainly improper" under the Supreme Court's latest jurisprudence regarding pleading standards); *see also Cooney v. Rossiter*, 583 F.3d 967, 972 (7th Cir. 2009) ("The complaint in this case, though otherwise detailed, is bereft of any suggestion, beyond a bare conclusion, that the remaining defendants were leagued in a conspiracy with the dismissed defendants"); *Evers*, 21 Fed. Appx. at 450. The court finds the above-cited cases far more persuasive than the pre-*Iqbal* cases cited by the plaintiff regarding what is necessary to properly plead a Section 1983 conspiracy claim.

depriving Mirbeau of its equal protection rights. Viewing the allegations as true, LDD and Mr. Muenster took the actions that they did to ensure that LDD could purchase the property in question at a low price, not because they had a broader desire to see Mirbeau's constitutional rights violated. *See, e.g.,* Sec. Am. Compl. ¶ 44 ("The LDD representative urged the City Council to approve the proposed referendum, which would . . . provide LDD with additional time to negotiate a purchase of the property"); *id.* ¶ 48 (alleging that LDD, in-part, funded "misleading advertisements and communications" regarding the memorandum in order to "obtain the property at less than market value"). While the City officials may have also shared in Muenster's and LDD's desire to have LDD develop the property in question, sharing one common goal is not the same thing as having a mutual goal to trample on someone's constitutional rights. *Hanania v. Loren-Maltese*, 212 F.3d 353, 357 (7th Cir. 2000). Moreover, LDD and Muenster may have requested that the City officials help LDD acquire the property on the cheap, but a mere request for the law to help a party accomplish even a nefarious goal is insufficient to expose a private party to federal liability under Section 1983. *Hughes,* 880 F.2d at 972.

While the plaintiff may argue that the court is splitting hairs by distinguishing between an alleged goal to violate Mirbeau's constitutional rights and an alleged goal to profit at Mirbeau's expense, the Seventh Circuit's jurisprudence mandates such a distinction. In *Hanania,* the plaintiff, per the advice of her private lawyer, signed a "worthless settlement agreement" that extinguished the plaintiff's claims

against the City of Cicero. *Hanania,* 212 F.3d at 357. The plaintiff filed a Section 1983 suit against her lawyer, arguing that the lawyer "was in cahoots with the Cicero officials when he convinced [her] to sign off on a settlement that was not in her interests," as the settlement agreement was brazen enough to include a section committing Cicero to refer litigation matters involving the city to the attorney's law firm. *Id.* 355-56. The Seventh Circuit affirmed the decision of the district court to dismiss the Section 1983 claim against the plaintiff's lawyer, noting that the "most that can be said about the [plaintiff's] allegations is that [the defendant's] actions do not appear to go beyond greed." *Id.* at 357. For the appellate court, the lawyer's actions were "not connected to the acts underlying the" Section 1983 claim, i.e., violations of the plaintiff's constitutional rights.

The court finds *Hanania* indistinguishable from the present case. The facts as alleged by Mirbeau indicate that LDD and Muenster merely desired to acquire land at a cheaper price, an allegation that, while perhaps demonstrative of a greedy motivation by LDD and Muenster, "fail[s] to demonstrate a desire by [the defendants] to snatch away [Mirbeau's] constitutional rights." *Id.* Moreover, LDD and Muenster's alleged actions are "not connected" to the acts underlying the Section 1983 claim – namely, the deprivation of Mirbeau's right to be free of "conduct of a government agent . . . that evidences a spiteful effort to 'get' [them] for reasons wholly unrelated to any legitimate state objective." *Forseth v. Village of Sussex*, 199 F.3d 363, 368-70 (7th Cir. 2000). Here, Mirbeau has simply not alleged that it was LDD and Mr.

Muenster's goal or interest to have the government act in a wholly arbitrary fashion in denying Mirbeau's zoning change application, requiring granting of the defendants motion with respect to the Section 1983 conspiracy claim against LDD and Mr. Muenster.[10]  *See Cunningham v. Southlake Center for Mental Health, Inc.*, 924 F.2d 106, 108 (7th Cir. 1991) (holding that a plaintiff alleging a Section 1983 conspiracy claim must prove that "each of the joint actors was in some part motivated by [a] unconstitutional purpose").  Assuming Mirbeau's allegations are true, LDD and Mr. Muenster were interested in making a profit for LDD and did not have any sort of meeting of the minds with the City officials with respect to Mirbeau's constitutional rights.  *See Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1352 (7th Cir. 1985)  ("In order to establish a conspiracy, the plaintiff must demonstrate that the state officials and the private party somehow reached an understanding to deny the plaintiffs their constitutional rights."); *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983) ("To prove a conspiracy between private parties and the government under § 1983, an agreement or 'meeting of the minds' to violate constitutional rights must be shown.").

---

[10]In fact, the complaint is silent as to whether LDD and Muenster wished the City officials to act arbitrarily or without reason in rejecting Mirbeau's zoning change application.  It would stand to reason that the last thing that LDD and Muenster desired was to have the City officials arbitrarily and without reason deny the zoning change, as such an action could be reversed under Wis. Stat. § 68.13.

The only case cited by Mirbeau to oppose LDD's and Muenster's motion to dismiss the Section 1983 conspiracy claim is *Hoskins v. Poelstra,* 320 F.3d 761 (7th Cir. 2003). *Hoskins,* which pre-dates the Supreme Court's watershed decisions in *Twombly* and *Iqbal,* stands for the proposition that a plaintiff alleging a conspiracy claim did not need to "plead a meeting of minds in detail." 320 F.3d at 764. The Seventh Circuit, influenced by the Supreme Court's decisions in *Twombly* and *Iqbal,* implicitly discarded the holding of *Hoskins* in *Cooney,* where the Court of Appeals held that a complaint alleging a conspiracy claim that was "bereft of any suggestion, beyond a bare conclusion, that the . . . defendants were leagued in a conspiracy" was "not enough" to survive a Fed. R. Civ. P. 12(b)(6) challenge. 583 F.3d at 971. The value of *Hoskins* is minimal: the plaintiff has failed to allege in detail that LDD and Mr. Muenster shared a goal with City officials to deprive Mirbeau of its constitutional rights. The court is obliged to dismiss the Section 1983 conspiracy claim against LDD and Mr. Muenster. The court next proceeds to discuss whether the Section 1983 conspiracy claim can survive Messrs. Connors' and Malmin's motion to dismiss.

### 2. Section 1983 Claim Against Messrs. Connors and Malmin

Given the above discussion, the court must determine whether the allegations made in the Second Amended Complaint against Messrs. Connors and Malmin, two private citizens at the time of the alleged conspiracy, show that the two defendants conspired with the City officials with the "ultimate goal" of depriving Mirbeau of its

constitutional rights to not be irrationally treated by the government. *See Hanania,* 212 F.3d at 357. However, even when the court assumes Mirbeau's allegations to be true, Mirbeau has not alleged that Messrs. Connors' and Malmin's "desire" was to have the City officials "snatch away" the plaintiff's constitutional rights. *Id.* Rather, much like the allegations levied against LDD and Mr. Muenster, the claims against Connors and Malmin indicate that the "agreement" between the latter two defendants and the City officials was to merely interfere with Mirbeau's contract. *See, e.g.,* Sec. Am. Compl. ¶ 120 ("Together they formulated and pursued a strategy of ongoing and improper tactics to delay review and approval of the Zoning Amendment Application for the purpose of preventing Mirbeau from consummating its Purchase Contract . . ."); *id.* ¶ 126 ("Muenster had already begun working with . . . Malmin . . . gathering information about the Property to use for purposes of delaying the rezone review"); *id.* ¶ 127 ("Roehrer . . . worked behind the scenes with . . . Connors, Malmin . . . in an effort to interfere with the pending Mirbeau Purchase Contract"); *id* ¶ 129 ("These defendants developed, organized, planned, and led a multi-front attack on Mirbeau, all designed to delay, disrupt, and interfere with Mirbeau's contract."). However, the right to be free of interference with one's contractual relationship is a qualified right that stems from state tort law and is not a "right, privilege, or immunity secured by the Constitution and the laws" of the United States, the touchstone for a 42 U.S.C. § 1983 lawsuit. Mirbeau's complaint and submissions to the court assume, without any support, that as long as the

plaintiff alleges that Connors and Malmin "conspired" or had an agreement to accomplish *any* illegal end, that such an allegation is an adequate pleading that Connors and Malmin are liable under Section 1983. Instead, Mirbeau must allege that the city officials and the non-city defendants reached an understanding to deprive the plaintiff of *its constitutional rights*. *Brokaw*, 235 F.3d at 1016. With respect to Connors and Malmin, much like its brief in response to LDD and Mr. Muenster's motion to dismiss, Mirbeau states that the "basis of [the] conspiracy claims" against Connors and Malmin is the plaintiff's allegations that the City officials violated Mirbeau's equal protection rights. (Pl.'s Resp. to Connors' Mot. to Dismiss Br. at 6). However, there is no allegation, other than the purely conclusory claims made at paragraph 113 of the second amended complaint,[11] that indicates that Malmin, Connors, and City officials had any sort of "meeting of the minds" to have the City treat Mirbeau wholly irrationally or without any legitimate basis. *See Cunningham,* 924 F.2d at 108. At best, the complaint is silent on whether Connors and Malmin wanted the city to act maliciously and arbitrarily in its treatment of Mirbeau and its zoning change application; rather the latest complaint only makes

---

[11] The deficiencies with paragraph 113 are discussed in footnote 7.

clear that Connors and Malmin wanted an end[12] – LDD to develop the property in question, (Sec. Am. Compl. ¶ 122) – but the two relevant defendants did not express any sort of opinion, let alone come to an agreement with City officials, that they wanted Mirbeau to be treated irrationally by the City.

Additionally, the deficiencies with Mirbeau's complaint with respect to the Section 1983 conspiracy claim against Connors and Malmin go far beyond the fact that the complaint does not allege that the two defendants wanted Mirbeau's constitutional rights to be trampled. Even if the court could somehow equate Connors' and Malmin's desires to interfere with Mirbeau's contract with a desire to have the City violate Mirbeau's constitutional rights, the latest complaint simply does not allege any sort of agreement between Connors and Malmin and *the City officials* regarding any illicit conduct. It is true that the complaint alleges that Connors and Malmin regularly communicated with Ms. Roehrer, *see* Sec. Am. Compl. ¶¶ 127, 134, 144-47), and LDD's representatives, *id.* ¶¶ 130, 133, 134, 144-47), with respect

_____

[12] The complaint also provides a rationale for why Connors and Malmin wanted LDD, in lieu of Mirbeau, to develop the property in question. Accepting the allegations as true, Malmin expressed concerns about overdevelopment in the Lake Geneva area and wanted an expansion of a local state park into the property in question. *See* Sec. Am. Compl. ¶¶ 130, 143. If Connors and Malmin wanted the City to reject Mirbeau's zoning change application because of environmental concerns, the two defendants had no desire to see Mirbeau treated irrationally by the City. Instead, the pleadings, accepted as true, indicate that Connors and Malmin wanted the City to reject the zoning application for very rational reasons and for reasons that are at the core of any city's decisions regarding zoning and land use. *See Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2006) ("The *Olech* class of one suit serves an important but relatively narrow function . . . it is not a vehicle for federalizing run-of-the-mill zoning, environmental, and licensing decisions"); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 71 L. Ed. 303, 47 S. Ct. 114 (1926) (holding that a property owner can challenge the constitutionality of a zoning restriction if it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare").

to interfering with Mirbeau's contract. However, both Roehrer and the representatives of LDD were private citizens for the overwhelming bulk of time the alleged incidents giving rise to the federal conspiracy claim occurred.[13] In fact, when discounting wholly conclusory allegations that lump Connors and Malmin with City officials, *see, e.g,. id.* ¶ 133 ("Muenster . . . conspired with Connors, Roehrer, Malmin, and Fesenmaier to advance LDD's improper efforts . . ."), the only allegation that either Connors or Malmin actually communicated with a city official in the relevant time period is alleged in paragraph 152 of the Second Amended Complaint. In that paragraph, Mirbeau alleges that on April 2, 2008, in an email that was directed to, among other defendants, Ms. Fesenmaier and Ms. Roehrer, members of the City Council, *id.* ¶¶ 5, 11, Mr. Malmin "expressed his concern that Mr. Chesen [, the then-Mayor of the City], would not permit 'LDD to give input' as to what should happen with the property." *Id.* ¶ 149. Assuming the allegation to be true, the email provides no hint that Malmin had any interest that the city deny Mirbeau's constitutional rights. Moreover, the complaint does not indicate whether Ms. Fesenmaier or Ms. Roehrer, as a city official, ever came to some sort of agreement with Mr. Malmin on any issue in his email, let alone on whether to violate the

---

[13] The complaint is unclear as to when Ms. Roehrer became a state-actor, but the complaint does say she was elected to the City Council on April 1, 2008. (Sec. Am. Compl. ¶ 11). The court assumes for purposes of resolving the motion to dismiss that Ms. Roehrer was a state-actor on April 1, 2008.

plaintiff's constitutional rights.[14]   In the final analysis, Mirbeau's complaint with respect to Connors and Malmin conspiring with City officials to violate the plaintiff's constitutional rights is thread bare and, as such, warrants dismissal of the claim.

Mirbeau argues, citing to *Hostrop v. Bd. of Jr. Coll. Dist. No. 515*, 523 F.2d 569, 576 (7th Cir. 1975), that it is irrelevant that the plaintiff did not allege that each defendant took "some action in furtherance of the conspiracy," because "liability attaches to every conspirator if any of them takes action in furtherance of the conspiracy." (Pl.'s Resp. Br. 9).  The court is unclear as to the thrust of Mirbeau's argument, leaving the court to conclude that Mirbeau is confused about the holding of *Hostrop*.  As the court noted in *Hostrop,* it is a basic concept that a "civil conspiracy extends liability for a tort . . . to persons other than the actual wrong doer."  *Hostrop*, 523 F.2d at 576.  However, the principle that *liability* for a tort extends to every member of a conspiracy presupposes that the plaintiff proves that a conspiracy exists in the first place, as was the case in *Hostrop.  Id.*  ("In the case at bar plaintiff has shown that defendants agreed and acted in concert in denying plaintiff a hearing.").  Here, as discussed above, the plaintiff has failed to allege facts, if assumed to be true, that indicate the non-city defendants conspired with City officials to violate Mirbeau's constitutional rights.  Accordingly, the court is obliged

---

[14] In fact, as the defendants note in their reply brief, the plaintiff "makes no allegations regarding Connors' or Malmin's involvement in City Council's decision to hold a referendum regarding Plaintiff's Zoning Amendment Application."  (Def.'s Reply Br. at 4).

to dismiss with prejudice[15] the seventh claim in the Second Amended Complaint as it pertains to the non-city defendants.

## B, Tortious Interference with Contractual Relations Claim

The seventh claim for relief alleged against LDD and Messrs. Connors, Malmin, and Muenster in Mirbeau's Second Amended Complaint is a claim for tortious interference with the April 23, 2007 contract the plaintiff had with Geneva Ridge. (Sec. Am. Compl. ¶¶ 116-158). The non-city defendants contend that the plaintiff's tortious interference claim is time-barred.[16] The first issue this court must

---

[15] Beyond asking leave to amend its complaint to correct typographical errors in the Second Amended Complaint, the plaintiff has not asked leave of court to amend its complaint if the court found other deficiencies with the federal claim. This fact standing alone allows this court to dismiss the federal claim with prejudice. *See James Cape & Sons Co. v. PCC Const. Co.,* 453 F.3d 396, 400-01 (7th Cir. 2006) (holding that a district court did not abuse discretion in dismissing claims with prejudice where the plaintiff only requested leave to amend its pleadings on an issue unrelated to why the pleadings were deficient). However, additional facts propel this court to dismiss the federal claim with prejudice. "[E]ach case must be evaluated on its own merit, in light of its own procedural history" when determining whether to dismiss a claim with or without prejudice. *Fannon v. Guidant Corp.*, 583 F.3d 995, 1002 (7th Cir. 2009). Here, the instant case has been pending in this court for over two years and is one of the oldest on this branch of the court's docket. For the reasons discussed in the body of this order, the plaintiff has had several opportunities to appropriately craft a complaint that states a claim for relief. It is notable, that the plaintiff's latest efforts to amend its complaint did not cure substantive problems with the complaint despite obvious issues with the complaint being raised by the defendants in their motions to dismiss. The court rightfully fears that further amendment would only yield another round of motions to dismiss, which would drag this litigation on even more. Additionally, the court notes that allowing the plaintiff another "shot" at alleging facts that the non-city defendants were involved in a conspiracy with City officials to violate Mirbeau's constitutional rights would severely prejudice the non-city defendants who are being dragged into the middle of two-year old litigation without any clear hope of a viable federal claim against those defendants. In short, the court finds that allowing further amendment to the plaintiff's complaint with respect to the federal conspiracy claim would create an undue delay in this litigation and would prejudice the non-city defendants. Accordingly, the court dismisses the federal claim against the non-city defendants with prejudice. *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 793 (7th Cir. 2004) (holding that delay "coupled with" prejudice to the non-moving party warrants denial of a motion to amend a complaint).

[16] While there are two separate motions to dismiss the tortious interference with contractual relations claim, the argument for both sides is the same, and the court will not differentiate between the two separate motions to dismiss, unless warranted by the parties' submissions.

resolve is what is the proper statute of limitations period for an action for tortious interference with contractual relations.[17]  The plaintiff contends that the statute of limitations for an action for tortious interference with contractual relations is six years as prescribed in Wis. Stat. § 893.53.  Section 893.53 is the state's residual personal injury statute of limitations and should apply unless another statute expressly prescribes a different period for bringing claims.[18]  *Hemberger v. Bitzer*, 216 Wis. 2d 509, 516, 574 N.W.2d 656 (1998).  Mirbeau bases its argument that the residual statute of limitations period applies for tortious interference with contractual relations claims on the case of *Segall v. Hurwitz*, 114 Wis. 2d 471, 487, 3339 N.W.2d 333 (Ct. App. 1983), which ruled as such. The *Segall* court found that a six-year limitations period was applicable because "no specific statute applies to a claim for injury from contractual interference."  *Id.* at 487.  However, the Wisconsin Court of Appeals recently noted the error in continuing to rely on *Segall* as good law:

> Turner's reliance on *Segall* is misplaced for two reasons.  First, it ignores the legislature's revision to WIS. STAT. § 893.57, which expanded the scope of claims subject to the two-year statute. Second, it fails to acknowledge that *Segall* applied the prior version of the statute.  WISCONSIN STAT. § 893.57's predecessor prescribed a two-year statute of limitations for "[a]n action to recover damages for

---

[17] The court notes that the law that will be applied in this case on the tortious interference claim is Wisconsin law.  In federal court, the choice of law is determined by the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941).  When the parties do not dispute what law should be applied, the court should apply forum law. *Futuresource L.L.C. v. Reuters Ltd.*, 312 F.3d 281 (7th Cir. 2002).

[18] That statute reads that "an action to recover damages for an injury to the character or rights of another, not arising on contract shall be commenced within 6 years after the cause of action accrues except where a different period is expressly prescribed, or be barred."  Wis. Stat. § 893.53.

libel, slander, assault, battery, invasion of privacy or false imprisonment." WIS. STAT. § 893.21(2) (1977). However, in 1979, the legislature renumbered and amended the statute, adding to the list of claims, "or other intentional tort to the person." WIS. STAT. § 893.57. Furthermore, although we decided *Segall* in 1983, the case dealt with the 1977 version of the statute because the action there had accrued before the statute's revision. *Segall's* interpretation of the statute of limitations has no applicability to the 1979 revised statute we are dealing with here.

*Turner v. Sanoski*, No. 2009AP1319, 2010 WI App 92, 2010 Wisc. App. LEXIS 464, ¶¶ 8-9 (Ct. App. 2010). As such, the plaintiff's citation to the *Segall* case is of little use to the court and leaves open the question as to whether there is a specific statute of limitations that controls tortious interference with contractual relations claims in lieu of Wisconsin's residual statute of limitations for tort claims.

However, that very question was resolved last year by the Wisconsin Court of Appeals in an unpublished opinion[19] where the court explicitly held that a claim for tortious interference with contractual relations is governed by Wis. Stat. § 893.57 because such a claim is encompassed by the language in that statute that prescribes a two-year limitations period for an action to recover damages for an "intentional tort to the person." *Stapel v. Stapel*, 2010 WI App 120, ¶ 34 n.9 (Ct. App. 2010). The plaintiff's only substantive objection to the holding of the *Stapel* case is that the unpublished opinion contradicts the language of Wis. Stat. § 893.57 and the *Turner* court's interpretation of that statute. Specifically, Mirbeau contends

---

[19] The plaintiff takes umbrage with the defendants citing to an unpublished opinion of the Wisconsin Court of Appeals. This court's local rules clearly allow such a citation. Civil L.R. 7(j)(1) ("[T]his court does not prohibit the citation of unreported or non-precedential opinions . . . ")

that the tort of interference with contractual relations is not an "intentional tort to the person," as the *Turner* court wrote that such a tort "involv[es] or consist[s] [of] an injury to one's person, reputation, or feelings, as distinguished from an injury or damage to real or personal property." 2010 WI App 92 at ¶ 12 (quoting *Black's Law Dictionary* (8th ed. 2004)). However, Mirbeau misreads the *Turner* case: the Wisconsin appellate court in *Turner* held that the tort of malicious prosecution met the definition of a tort to the person, but failed to state that *all* intentional torts that created damage to real or personal property did not have the limitations period dictated by Wis. Stat. § 893.57. Rather, the *Turner* court, assuming the plaintiff's general premise – that § 893.57's limitations period did not reach intentional torts that were not "personal" in nature – to be true, found that the tort of malicious prosecution fit within the plaintiff's own interpretation of the statute.

The jurisprudence of the Wisconsin Supreme Court casts doubts on the legal efficacy of the interpretation of § 893.57 made by the plaintiff, and assumed to be true by the court, in *Turner.* The Wisconsin Supreme Court in *Beloit Liquidating Trust v. Grade*, 2004 WI 39, 70 Wis. 2d 356; 677 N.W.2d 298 (2004), concluded that what the *Turner* court assumed to be law – that only intentional torts that were of a personal nature had a limitations period governed by § 893.57 – was indeed not the law. Specifically, the *Grade* court held that "the two-year statute of limitations set forth in Wis. Stat. § 893.57 is applicable, because a breach of fiduciary duty claim involves an intentional tort." *Id.* ¶ 40. The Wisconsin Supreme Court, in interpreting

§ 893.57, seems to discard the words "to the person" in the statute and allows § 893.57 to dictate the controlling limitations period for *all* intentional torts, even those of an economic nature. *Id.* (holding that Wis. Stat. § 893.57 is the relevant statute of limitations for a breach of fiduciary duty); *see also Jones v. Secura Ins. Co.*, 2002 WI 11, ¶ 23, 249 Wis. 2d 623; 638 N.W.2d 575 (2002) (holding that § 893.57 governs the intentional tort of insurer bad faith); *Warmka v. Hartland Cicero Mut. Ins. Co.*, 136 Wis. 2d 31, 36, 400 N.W.2d 923 (1987) (same); *see generally Gouger v. Hardtke*, 167 Wis. 2d 504, 511, 482 N.W.2d 84 (1992) ("[T]he statute of limitations for an intentional tort is two years."). "In a case in federal court in which state law provides the rule of decision, the federal court must predict how the state's highest court would decide the case and decide it in the same way." *Mindgames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 655 (7th Cir. 2000). Here, all of the relevant case law indicates that the Wisconsin Supreme Court would find that § 893.57 provides the limitations period for a tortious interference with contractual relations claim, and this court holds as such.

Slightly complicating matters is that Wis. Stat. § 893.57 was amended last year to expand the limitations period within which an intentional tort claim can be commenced from two years to three years. 2009 Wis. Act. 120. However, the act that amended § 893.57 provides that the relevant change "first applies to injuries occurring on the effective date of" the act, February 25, 2010. *Id.* As such, any injuries occurring before the date of February 25, 2010, are governed by a two-year

limitations period, as previously provided under Wis. Stat. § 893.57. Because Mirbeau readily acknowledges that its injury did not occur after February 25, 2010, the relevant limitations period is two years.

The defendants' argument regarding whether Mirbeau's tortious interference with contractual relations claim is timely is simple: Mirbeau's contract with Geneva Ridge expired on April 23, 2008, and, therefore, any injury resulting from the four defendants' respective actions occurred no later than April 23, 2008, more than two years before the plaintiff filed its Second Amended Complaint against the non-city defendants. The plaintiff, on the other hand, contends that the two-year limitations period "did not [begin] to run until Mirbeau received [electronically stored information] from the Town of Linn on June 11, 2010," which allowed the plaintiff to "confirm the tortious inference by the Noncity defendants with Mirbeau's Purchase Contract." (Pl.'s Resp. Br. 11, 18).

Mirbeau's argument adds another wrinkle into the court's analysis of whether the plaintiff's state law claim is barred by the statute of limitations. Wisconsin courts, in interpreting Wisconsin statutes of limitations, have noted that it would be "manifestly unjust for the statute of limitations to begin to run before a claimant could reasonably become aware of the injury." *Hansen v. A.H. Robins, Inc.*, 113 Wis. 2d 550, 559, 335 N.W.2d 578 (1983). Accordingly, the so-called "discovery rule" "tolls the statute of limitations until the plaintiff discovers or with reasonable diligence should have discovered that he or she has suffered actual damage due to wrongs

committed by a particular, identified person." *Doe v. Archdiocese of Milwaukee*, 211 Wis. 2d 312, 335, 565 N.W.2d 94 (1997) (internal citations omitted). Moreover, even where an injury is known, the statute of limitations does not begin running until the claimant has an "objective belief to a reasonable certainty as to the cause of the injury." *Deborah S.S. v. Yogesh N.G.*, 175 Wis. 2d 436, 445, 499 N.W.2d 272 (Ct. App. 1993). Here, Mirbeau argues that the City defendants imposed "many roadblocks and challenges"[20] that prevented the plaintiff from fully understanding the non-city defendants' role in their alleged efforts to derail Mirbeau's contract with Geneva Ridge. (Pl.'s Resp. Br. at 11). Mirbeau claims that it only fully understood the defendants' potential liability for a tortious interference with contractual relations claim when the plaintiff acquired, via a public records request, a series of emails that indicated that LDD and Muenster were privately communicating with City officials and members of FOGL to ensure that LDD acquired the property in question. *Id.* at 16-18. Ultimately, Mirbeau argues that only when it acquired the emails from the Town of Linn in June of 2010, did it "objectively [know] about a cause of its inability to obtain a timely decision from the City on its Zoning Amendment Application." *Id.* at 18.

However, Mirbeau's statement in its response brief is belied by several allegations in its Second Amended Complaint that indicate that Mirbeau knew about

---

[20] Among these roadblocks and challenges, Mirbeau cites "dilatory discovery tactics, destruction of hard drives, deletion of ESI, motions to stay discovery, disobedience of subpoenas *duces tecum*, and less than candid responses to discovery requests. (Pl.'s Resp. Br. at 11).

the four defendants' efforts to interfere with Mirbeau's contract before April 23, 2008. The plaintiff broadly asserts in its Second Amended Complaint that LDD, Muenster, Connors, and Malmin "worked . . . *publically* . . . to improperly, and without justification interfere with Mirbeau's" contract from January 2008 through the April 28, 2008 City Council vote defeating the zoning amendment application. (Sec. Am. Compl. ¶ 150) (emphasis added). Mirbeau alleges that one cause or "motivation behind approval of the referendum" that allegedly derailed the plaintiff's contract was "revealed during the December 10, 2007 City Council Meeting," when a representative of LDD addressed the City Council and "urged the City Council to approve the proposed public referendum." *Id.* ¶ 44. Later in its complaint, Mirbeau describes LDD's actions at the December 10, 2007 meeting as LDD "publiciz[ing] its desire to interfere with [the plaintiff's] purchase contract." *Id.* ¶ 126. Mirbeau readily acknowledges in the complaint that it was present at the meeting on December 10, 2007, and that it voiced "protestations and objections" at the meeting to the actions encouraged by LDD. *Id.* ¶ 43. Moreover, Mirbeau states in its latest complaint that on the same day of the meeting, LDD delivered a letter to representatives of Mirbeau and Geneva Ridge, offering to purchase the property in question, "confirm[ing] LDD's intent to interfere with Mirbeau's purchase contract." *Id.* ¶ 124. Additionally, Mirbeau's complaint alleges that Malmin, one of the "most active members of FOGL," *id.* ¶ 126, and Connors, the "founder and treasurer" of Vote-No, *id.* ¶ 16, were at the heart of the political groups publically organizing the efforts to prevent

Mirbeau from developing the property in question. The complaint is clear that both FOGL and Vote-No were quite public in their opposition to Mirbeau's zoning change application, including making "representations" through FOGL to "members of the public" about "more 'desirable' plans to develop the property" in question, *id.* ¶ 137, having a notable presence at a local festival in the City, *id.* ¶ 146, and raising money for Vote No, including filing campaign finance statements.[21] *Id.* ¶ 148. In short, accepting the plaintiff's allegations as true, the non-city defendants were very noticeably and very publically attempting to interfere with Mirbeau's contract in late 2007 and early 2008.

The court can only conclude that Mirbeau knew that the non-city defendants were interfering with the contractual relationship Mirbeau had with Geneva Ridge in December of 2007. While it is "irregular" to dismiss a claim as untimely under a Fed. R. Civ. P. 12(b)(6), as a complaint does not need to anticipate potential affirmative defenses, when the plaintiff "effectively pleads [itself] out of court by alleging facts that are sufficient to establish" an affirmative defense, such as the statute of limitations, dismissal is appropriate. *Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006); *see also* Fed. R. Civ. P. 8. Such is what occurred in the instant case. The elements of a claim for tortious interference with contract require that the claimant show: (1) the plaintiff had a current or prospective contractual relationship

---

[21] Moreover, there is no question that Mirbeau knew of Connors and Malmin's involvement in these organizations far before it received emails from the Town of Linn, as Mirbeau "made efforts to depose" the relevant defendants in February of 2010. (Pl.'s Resp. Br. 17).

with a third party; (2) the defendant interfered with that relationship; (3) the interference was intentional; (4) a casual connection exists between the defendant's interference and the plaintiff's damages; and (5) the defendant was not justified or privileged to interfere. *Wolnak v. Cardiovascular & Thoracic Surgeons of Central Wis, S.C.*, 2005 WI App 217, ¶14, 287 Wis. 2d 560, 706 N.W.2d 667 (Ct. App. 2005). The alleged *public* actions of the non-city defendants that occurred in late 2007 and early 2008 – if Mirbeau is correct that the defendants were acting in an unprivileged capacity by influencing the government to "follow an unlawful course," (Pl.'s Resp. Br. 22) – were enough to immediately make out a claim for tortious interference with contract on April 23, 2008, the date on which the plaintiff was actually harmed. While Mirbeau may have learned more about the non-city defendants' actions in the midst of this litigation, Mirbeau has plead that it knew enough to bring a plausible claim for tortious interference with a contractual relationship against the non-city defendants by April 23, 2008.[22] It is apparent from

---

[22] In fact, Mirbeau's implicit argument that the limitations period does not begin until a plaintiff "objectively knows" that there is a viable claim for tortious interference exists, (Pl.'s Resp. Br. at 18), taken to its logical conclusion would extend the statute of limitations period almost endlessly, as no one "objectively knows" there has been a tortious interference with a contractual relationship until a jury rules as such. Instead, the far more logical conclusion is that the statute of limitations period begins when the plaintiff can allege enough facts to survive a motion to dismiss. *Cf. Fail-Safe LLC v. A.O. Smith Corp.*, No. 08-CV-310, 2010 U.S. Dist. LEXIS 92454, at *72-73 (E.D. Wis. Sept. 3, 2010) (holding that the limitations period under Wisconsin law for a trade secret misappropriation claim does not begin until the plaintiff has sufficient information to state a claim that could survive a motion to dismiss). Here, the court concludes that Mirbeau had such information on April 23, 2008. The court well-appreciates the frustrations that the plaintiff has had with acquiring information in discovery, but a complaint must be filed when the plaintiff can allege enough facts to survive a motion to dismiss, not when the plaintiff has enough facts such that judgment for the plaintiff is all but a foregone conclusion. If such an interpretation of the discovery rule existed, the statute of limitations would be rendered meaningless.

Mirbeau's latest complaint that the events providing a cause of action for tortious interference with a contractual relationship occurred well outside of the statute of limitations period. Because the discovery rule only tolls the statute of limitations until the plaintiff discovered or, in the exercise of reasonable diligence, should have discovered all of the elements of its claim, and because Mirbeau has plead that it knew all the elements of its claim by April of 2008, the court has no choice but to dismiss Mirbeau's claims against the non-city defendants. *See Doe*, 211 Wis. 2d. at 338. Given the two-year limitations period, Mirbeau bringing a complaint against the non-city defendants on July 1, 2010, was far too late. Accordingly, dismissal with prejudice[23] of all of the claims raised against LDD and Messrs. Muenster, Malmin, and Connors is appropriate.[24]

## MOTION TO AMEND

In conjunction with its brief in response, Mirbeau filed a motion for leave to file the Third Amended Complaint to correct the typographical errors in the Second Amended Complaint and to incorporate the allegations of tortious interference with contract into the Section 1983 claim against the non-city defendants. (Docket #119).

---

[23] The court finds that any amendment of the tortious interference claim against the non-city defendants would be futile, as the plaintiff has plead itself out of court with respect to the statute of limitations issue.

[24] The court will deny the plaintiff's motion for leave to file a sur-response brief in opposition to the motions to dismiss. (Docket #127). The plaintiff's sur-response brief merely parrots its arguments from its response brief and concedes the defendants' arguments regarding whether Mirbeau plead itself out of court. The sur-response adds nothing, and, accordingly, the court denies the plaintiff's motion.

A district court may deny leave to amend for "undue delay, bad faith, dilatory motive, prejudice, or futility." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 740 (7th Cir. 2007). Futile repleadings include "restating the same facts using different language, reasserting claims previous determined, failing to state a valid theory of liability, and the inability to survive a motion to dismiss." *Garcia v. City of Chicago*, 24 F.3d 966 (7th Cir. 1994). Here, the amendment to the complaint does not repair the substantive problems with Mirbeau's Second Amended Complaint, and, finding it futile for Mirbeau to file its Third Amended Complaint, the court will deny the plaintiff's motion.

## MOTIONS REGARDING DEFAULT JUDGMENT

The only remaining issue for the court to resolve at this juncture is whether the court should enter a default judgment against Mr. Malmin. On August 5, 2010, the plaintiff moved, pursuant to Fed. R. Civ. P. 55(a), for an entry of a default judgment against Mr. Malmin and an order "setting a date and time for a hearing for purposes of determining the amount of default judgment damages to be awarded in favor of Mirbeau and against Malmin." (Docket #91). The following day, Mr. Malmin filed a motion to set aside default pursuant to Fed. R. Civ. P. 55(c) and requested that the court grant Mr. Malmin leave to file a motion to dismiss. (Docket #100).

The court may set aside an entry of default "for good cause shown." Fed. R. Civ. P. 55(c). The court considers whether the moving party has shown: (1) good cause for default; (2) quick action to correct it; and (3) a meritorious defense to

plaintiff's complaint. *See Pretzel & Stouffer v. Imperial Adjusters, Inc.*, 28 F.3d 42, 45 (7th Cir. 1994). Here, Mr. Malmin has demonstrated that: (1) he took quick action to remedy the default, acting promptly with a motion to the court to set aside the entry of default; and (2) he has, as discussed above, a meritorious defense to the complaint. The only issue is whether there was good cause for the default. Before exploring each sides' arguments, the court notes that default judgments are generally disfavored because they are inconsistent with the courts' preference to resolve disputes on the merits. *See Coon v. Grenier,* 867 F.2d 73 (1st Cir. 1989). Moreover, the district court is given great latitude in assessing the circumstances of the case to discern if good cause for setting aside an entry of default exists. *Jones v. Phipps*, 39 F.3d 158, 164 (7th Cir. 1994).

Mr. Malmin's motion to set aside default states that the failure to file a response to the plaintiff's complaint occurred as a result of miscommunication between the client and the attorney, with Mr. Malmin's counsel understanding that the date of service occurred on July 19, 2010, instead of July 12, 2010, the actual date the defendant was served. (Def. Malmin's Mot. ¶ 15). Additionally, Mr. Malmin, in an affidavit to the court, contends that he mistakenly told his attorney the wrong date because of a serious illness that affected his mental health. (Malmin Aff. ¶¶ 8-9). Moreover, the defendant's attorney argues that it was reasonable for the attorney to not question the date of service being July 19, 2010, as Mr. Connors was served on July 18, 2010. *Id.* ¶ 16. The plaintiff responds, citing to *Pretzel & Stouffer,* that

a simple "miscommunication" over the service date of a summons does not constitute "good cause" to set aside default. (Pl.'s Resp. Br. at 2).

The facts of this case counsel the court to set aside the entry of default. Unlike in *Pretzel & Stouffer*, the attorney in this case never knew the *actual* date that his client was served with the complaint until the motion for default judgment was made. Mr. Malmin, who avers that he is battling serious health problems, mistakenly told his attorney the wrong date the plaintiff served the defendant. Moreover, in contrast to *Pretzel & Stouffer*, there was not a wholesale lack of communication between the client and the attorney in this case. 28 F.3d at 45. Rather, the defendant and his attorney were communicating, but there was a simple mistake regarding a date. Sustaining the entry of default and allowing the defendant to be subject to liability is an extremely harsh penalty for a relatively minor mistake that was quickly rectified. See *Sims v. EGA Prods.*, 475 F.3d 865, 868 (7th Cir. 2007) ("[D]elay that imposes slight injury does not call for multi-million-dollar awards."). Given that Rule 55(c) "requires 'good cause' for the judicial action" and "not 'good cause' for the defendant's error," and given that "damages disproportionate to the wrong afford good cause for judicial action," the court finds that "good cause" exists to set aside the entry of default. *Id.*

## CONCLUSION

In closing, the court notes that on August 10, 2010, the court stayed discovery in this action until the court ruled on the pending motions to dismiss. Consistent with

this court's August 30, 2010 order, the stay is now lifted and the remaining defendants have forty days following the date of this order by which to disclose expert witnesses and produce expert reports. However, before continuing this litigation any further, both parties should contemplate whether this case, which, unlike fine wine, is not improving with age, can be resolved short of this court further involving itself in the process. Such an alternative may prove to be far less costly and may, in the end, resolve the competing concerns and interests of the remaining parties. Moreover, the parties are reminded that the remaining federal claims in this case are extremely narrow avenues for relief, as "federal courts are ordinarily not vehicles to review zoning board decisions." *Harding v. County of Door*, 870 F.2d 430, 432 (7th Cir. 1989). Before following what has regrettably become the routine of this case of filing motions before communicating with opposing counsel, counsel for all sides should very seriously contemplate whether this forum is truly the most appropriate and the most advantageous venue in which to satisfy the concerns of each of their respective clients.[25]

Accordingly,

---

[25] On October 20, 2010, Mirbeau filed a motion to strike the supplemental response of Messrs. Connors and Malmin filed on October 6, 2010. (Docket #135). The supplement of the two defendants is in excess of the briefing allowed by the local rules, Civil L.R. 7, and, as such, the defendants should have filed a motion requesting leave to file the supplement to the record. Civil L.R. 7(i). Having not done that, the court is obliged to strike the submission. Messrs. Connors and Malmin submitted a motion for leave to file the supplemental authority originally filed at Docket #135 on October 22, 2010. (Docket #136). As that authority does not speak to any issue reached by the court in this decision, the motion will be denied as moot.

**IT IS ORDERED** that plaintiff's motion for default judgment as to defendant Richard Malmin (Docket #91) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that defendant LDD's and Muenster's motion to dismiss (Docket #96) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that defendant Malmin's motion to set aside default (Docket #100) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that defendant Malmin's motion for leave to file a motion to dismiss (Docket #100) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that defendant Malmin's motion to dismiss (Docket #100, Ex. A) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that defendant Connors' motion to dismiss (Docket #101) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that plaintiff's claims against defendants Connors, LDD, Malmin, and Muenster be and the same are hereby **DISMISSED** with prejudice;

**IT IS FURTHER ORDERED** that plaintiff's motion for leave to file Third Amended Complaint (Docket #119) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that plaintiff's motion for leave to file a sur-response brief in opposition to motions to dismiss (Docket #127) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that plaintiff's expedited nondispositive motion to strike (Docket #135) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that defendants' motion for leave to file supplemental authority (Docket #136) be and the same is hereby **DENIED** as moot; and

**IT IS FURTHER ORDERED** that the stay imposed by the court's August 10, 2010 order (Docket #111) be and the same is hereby **LIFTED**.

Dated at Milwaukee, Wisconsin, this 27th day of October, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge